UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                 :
GYPSY C.[1]                      :                   3:20 CV 00558 (RMS)
                                   :
V.                                   :
                                   :
KILOLO KIJAKAZI,[2]            :
ACTING COMMISSIONER OF     :
SOCIAL SECURITY            :               DATE: SEPTEMBER 9, 2021
                                   :
------------------------------------------------------ x

<u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under §§ 205(a) and 1631(c)(3) of the Social Security Act as amended, and 42 U.S.C. §§ 405(g) and 1383(c), seeks review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

I.    <u>ADMINISTRATIVE PROCEEDINGS</u>

The plaintiff filed her initial claim for DIB and SSI on March 30, 2017, claiming that she had been disabled since November 10, 2017, due to right shoulder degenerative joint disease, cervical degenerative disc disease, hypertension, bilateral carpal tunnel syndrome, bipolar

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. *See* 42 U.S.C. § 405(g).

disorder, posttraumatic stress disorder, and personality disorder.[3] (Certified Transcript of Administrative Proceedings ["Tr."] 74-88, 230-245). The plaintiff's application was denied initially on October 24, 2017 (Tr. 21, 89-103), and upon reconsideration on February 23, 2018. (Tr. 21, 159-165).

On April 4, 2018, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 21, 166), and on December 18, 2018, a hearing was held before ALJ John Noel, at which the plaintiff and a vocational expert, Michael Dorval, testified. (Tr. 21, 39-73). The ALJ subsequently issued an unfavorable decision on January 24, 2019, denying the plaintiff's claims for benefits. (Tr. 18-38). On February 18, 2019, the plaintiff submitted a request for review of the hearing decision, and on February 18, 2020, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 13-17).

On April 27, 2020, the plaintiff filed her complaint in this pending action, (Doc. No. 1; *see* Tr. 1 (order of the Appeals Council granting an extension to commence a civil action)).[4] Counsel represented the plaintiff at the administrative level, but she commenced this action as a self-represented party. On May 18, 2020, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned. (Doc. No. 14). On June 25, 2020, the defendant moved to stay the proceedings due to the Covid-19 pandemic (Doc. No. 15); the motion was granted in limited part such that the Court ordered a 60-day stay of the proceedings. (Doc. No. 16).  On August 24, 2020, the defendant sought an extension of the stay (Doc. No. 17), which the Court granted for an additional 60 days.  (Doc. No. 18).  Thirty-five days later, on September 29, 2020, the defendant filed the certified administrative record. (Doc. No. 19).

---

[3] During her hearing before the Administrative Law Judge, the plaintiff amended the onset date of her disability for purposes of her claim for benefits from January 1, 2017 to November 10, 2017. (Tr. 21, 52).
[4] On the same day, the plaintiff filed a Motion for Leave to Proceed *In Forma Pauperis* (Doc. No. 2), which the Court granted. (*See* Doc. No. 10).

On November 23, 2020, the plaintiff filed a Motion to Appoint Counsel (Doc. No. 21) and a motion to "continue [the] case." (Doc. No. 23). The Court denied the plaintiff's Motion to Appoint Counsel and extended the briefing deadline "to afford the plaintiff time to seek counsel and comply with the scheduling order." (Doc. No. 23). On January 22, 2021, the plaintiff filed two documents captioned as the plaintiff's dispositive motion. (Doc. Nos. 25-26). The Court construed the first filing as a Renewed Motion to Appoint Counsel, which the Court granted, and in doing so, extended the dispositive motion deadline. (Doc. No. 27). On February 11, 2021, *pro bono* counsel filed an appearance, and on March 26, 2021, counsel moved for an extension of the dispositive motion deadline. (Doc. Nos. 30-31). The Court granted the motion (Doc. No. 32), and on April 30, 2021, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 33), with brief (Doc. No. 33-1 ["Pl.'s Mem."]) and Statement of Material Facts (Doc. No. 33-2) in support.  On June 29, 2021, the defendant filed his Motion to Affirm (Doc. No. 35), with his brief  (Doc. No. 35-1 ["Def.'s Mem."]), and Statement of Material Facts (Doc. No. 35-2).[5]

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 33) is DENIED, and the defendant's Motion to Affirm (Doc. No. 35) is GRANTED.

II.   FACTUAL BACKGROUND

A.   HEARING TESTIMONY

On the date of her hearing, the plaintiff was 45-years old and a mother of two grown children, neither of whom lived with her. (Tr. 44-45). The highest level of education completed by the plaintiff was eleventh grade. (Tr. 45). The plaintiff testified that she worked at the front desk

---

[5] On July 16, 2021, the plaintiff filed a Consent Motion for Extension of Time until August 3, 2021 to file a reply brief. (Doc. No. 36). The Court granted the motion; however, the plaintiff did not file a reply brief. (Doc. No. 37).

of a hotel in 2011, which job involved checking people in and out of their rooms, as well as cooking and serving eggs at the hotel's breakfast buffet. (Tr. 46-48). The plaintiff testified that she had worked at three different hotels in 2011 and was fired from each of them. (Tr. 49). The plaintiff also testified that she was self-employed as a housekeeper in 2013. (Tr. 50). Following her work as a housekeeper, the plaintiff worked at LogistiCare Solutions as a customer service representative where she would book services for Medicaid recipients and typed for more than seven hours a day. (Tr. 50-51). While at LogistiCare Solutions, the plaintiff was "written up a couple of times" for being late to, or absent from, work, which she attributed to increased drowsiness caused by her pain medication. (Tr. 60). The plaintiff stopped working on March 9, 2018. (Tr. 53).

When asked by the ALJ about her work limitations, the plaintiff responded that she was "always in pain" and could not function like she used to, as a result of the carpal tunnel in her hands and pain in her neck and right shoulder. (Tr. 54). In addition, the plaintiff testified that she was depressed and could not sleep. (Tr. 54). With respect to her depression, the plaintiff testified that she had telephonic sessions with her psychiatrist two or three times per week and wanted to try seeing a therapist. (Tr. 56). The plaintiff explained that she was still unpacking the trauma of losing her son[6] and her mother at a young age, stating that her and her psychiatrist were "still stuck on that subject so far." (Tr. 63-64).

As to her physical limitations, the plaintiff testified that undergoing a carpal tunnel release surgery to treat her carpal tunnel syndrome in her right hand made the pain worse, likening it to someone stabbing her in the palm and wrist. (Tr. 54). After undergoing the carpal tunnel release, the plaintiff went on Workers' Compensation for two months before returning to work with

---

[6] The plaintiff's 18-month-old son died while in the care of his father, who is incarcerated for neglect and manslaughter of the child. (Tr. 340).

restrictions. (Tr. 61). The plaintiff testified that she was upset with her employer for failing to give her a job that accommodated her restrictions. (Tr. 61). With respect to her left hand, the plaintiff testified that she did not get the same stabbing pain because she did not undergo a carpal tunnel release, however, she did suffer from intense numbness from the left wrist up to her elbow. (Tr. 54-55). The plaintiff also described her shoulder pain as a "never-ending Charley horse," which would remain "cramped all the time," despite the use of Lidocaine patches and pain killers. (*Id.*). As a result of her physical limitations, the plaintiff testified that she could not do housework, grocery shop, cook, or drive, noting that her daughter would help her with those daily tasks every other weekend. (Tr. 55).

The vocational expert testified that, under the Dictionary of Occupational Titles ("DOT"), the plaintiff's work as a customer service representative would be characterized as an appointment setter, performed at the sedentary exertional level. (Tr. 65). The vocational expert also testified that the plaintiff's work as a housekeeper would be considered an unskilled job performed at the light exertional level. (Tr. 66). Finally, as to the plaintiff's work at the hotel, the vocational expert testified that the plaintiff's front desk work was at the light exertional level and that her cooking work was a semiskilled job performed at the light exertional level. (Tr. 66).

The vocational expert testified further that a person with the plaintiff's past work experience, who was capable of light work with frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds, and frequent balancing, stooping, kneeling, crouching, and crawling, as well as only occasional contact with the public and no team-oriented work with coworkers, could not perform the plaintiff's past work as an appointment setter. (Tr. 66-67). According to the vocational expert, if an individual had the same exertional limitations and was limited to occasional contact with the public, such an individual could perform the work of a

garment folder, an assembler, and a hand packager, which are light unskilled jobs. (Tr. 67-68). Such jobs, however, would be precluded for an individual who could only occasionally handle and finger bilaterally. (Tr. 68-69). The vocational expert testified that, at that exertional level, "there would not be any unskilled jobs for that person." (Tr. 69). For sedentary jobs with frequent handling and fingering, however, the vocational expert testified that an individual could perform the work of a polisher of optical goods, a print machine tender, and a security system monitor. (*Id.*). Finally, the vocational expert testified that an individual who is off-task greater than ten percent of the workday would not be able to maintain a full-time job. (Tr. 70).

B.    MEDICAL HISTORY

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the Statement of Facts. (Doc. Nos. 33-2, 35-2). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.[7]

III.   THE ALJ'S DECISION

Following the five-step evaluation process,[8] the ALJ first found that the plaintiff met the insured status requirements of the Social Security Act through December 31, 2022. (Tr. 23). The

---

[7] The plaintiff's onset date of disability is November 10, 2017.  Her medical records date back to December 2013. (*See* Tr. 348-49).

[8] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, the claimant will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability

ALJ also determined that the plaintiff had not engaged in substantial gainful activity since November 10, 2017, the amended alleged onset date. (Tr. 23, citing 20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*). Notably, the ALJ reasoned that, although the plaintiff consistently worked for LogistiCare Solutions through the first quarter of 2018, the record did not establish that the plaintiff was engaged in continuous full-time work activity due to various health related absences. (Tr. 23-24). Thus, the ALJ concluded that the plaintiff's work activity constituted an "unsuccessful work attempt." (Tr. 24).

At step two, the ALJ concluded that the plaintiff had the severe impairments of carpal tunnel syndrome, hypertension, degenerative joint disease of the right shoulder, and posttraumatic stress disorder. (*Id.*, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)). In addition, the ALJ noted that the plaintiff had degenerative disc disease of the cervical spine. (Tr. 24). The ALJ reasoned, however, that because the plaintiff's treatment was focused primarily on her shoulder and hand impairments, the evidence of record established that her cervical spine limitation was non-severe. (*Id.*).

At step three, the ALJ found that the plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 24). The ALJ stated that, having considered all of the listed impairments, the "medical evidence does not substantiate listing level severity of the claimant's impairments, either individually or in combination, and no acceptable medical source has mentioned findings

---

benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

equivalent in severity to the criteria of any listed impairment, individually or in combination." (*Id.*).

At step four, the ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967 (b), except that she could frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch crawl, and handle and finger bilaterally; could have no contact with the public; and could not work on a team with coworkers. (Tr. 26). In reaching this conclusion, the ALJ gave "great weight" to the opinions of the state agency medical and psychological consultants, Dr. Robert McGuffin, Dr. Brent Packer, Dr. Jerrold Goldman, and Dr. Christopher Leveille, "partial weight" to the opinion of Christopher Dillon, PA-C, who opined on the plaintiff's physical impairments following hand surgery, "little weight" to the opinion of Kristen Haney, APRN, who opined on the plaintiff's physical impairment of hypertension, and "little weight" to the Global Assessment of Functioning scores that were assessed throughout the medical record. (Tr. 29-30).

At step five, the ALJ concluded that the plaintiff was not capable of performing past relevant work as an appointment setter, domestic cleaner, housekeeper, front desk clerk, or buffet server. (Tr. 31, citing 20 C.F.R. §§ 404.1565 and 416.965). Having considered the plaintiff's age, education, work experience, and RFC, however, the ALJ reasoned that the plaintiff could perform the light work occupations with "additional limitations" that "erode the unskilled light occupational base." (Tr. 31).   The ALJ concluded that the vocational expert's testimony, incorporating the plaintiff's RFC, supported a finding that the plaintiff could perform the work of a garment folder, small products assembler, inspector, and hand packager. (Tr. 31-32, citing 20 C.F.R. §§ 404.1569, 404.1569a, 416.969, and 416.969a).   Accordingly, the ALJ concluded that

the plaintiff was not disabled from her onset date of November 10, 2017, through the date of his

decision.  (Tr. 32, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

IV.   <u>STANDARD OF REVIEW</u>

      The scope of review of a Social Security disability determination involves two levels of

inquiry. First, the court must decide whether the Commissioner applied the correct legal principles

in making the determination. Second, the court must decide whether the determination is supported

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted).

The court may "set aside the Commissioner's determination that a claimant is not disabled only if

the factual findings are not supported by substantial evidence or if the decision is based on legal

error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation

omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind

would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v.

Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189

(D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)

(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its

judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993)

(citation omitted). Instead, the court must scrutinize the entire record to determine the

reasonableness of the ALJ's findings. *See id*. Furthermore, the Commissioner's findings are

conclusive if supported by substantial evidence and should be upheld even in those cases where

the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v.*

*Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

## V.     DISCUSSION

The plaintiff contends that the ALJ erred insofar as he (1) failed to consider properly the plaintiff's impairments and combination of impairments and (2) failed to weigh appropriately the evidence of record in reaching his RFC determination. (Pl.'s Mem. at 10-20). In response, the defendant maintains that substantial evidence did, in fact, support the ALJ's findings, particularly those at step two and step three of the five-step evaluation. (Def.'s Mem. at 4-12). Additionally, the defendant asserts that the vocational expert's testimony supports the ALJ's decision. (Def.'s Mem. at 12-13).

### A.     SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S STEP TWO AND STEP THREE FINDINGS

At step two of the sequential analysis, an ALJ must determine if a claimant has a severe impairment.  *See* 20 C.F.R. §§ 404.1520 and 416.920.  To be found severe, an impairment must significantly limit the individual's ability to perform basic work activities for a continuous 12-month period.  42 U.S.C. § 423(d); 20 C.F.R. §§ 404.1522 and 416.922.

The plaintiff asserts that the ALJ failed to consider her severe medical impairments in combination with her non-severe impairments during his step two and step three analyses. (Pl.'s Mem. 11-12). At step two, the ALJ determined that the plaintiff had four severe impairments: carpal tunnel syndrome, hypertension, degenerative joint disease of the right shoulder, and posttraumatic stress disorder. (Tr. 24). Additionally, the ALJ determined that the plaintiff had degenerative disc disease of the cervical spine but based on the evidence of record, her condition was non-severe. (*Id.*). The plaintiff contends that, at step two, the ALJ should have considered the combined effect of the plaintiff's other medical issues, namely, chest pain, bipolar disorder, and

alcohol and opioid abuse, with her severe impairments. (Pl.'s Mem. at 11-12). The plaintiff contends further that the ALJ's step three analysis was flawed to the extent that he failed to consider if the plaintiff's other impairments met the requirements for severity under the Social Security listings. (*Id.*).

As a threshold matter, the plaintiff bears the burden of showing that she has a medically severe impairment or combination of impairments. *Grant v. Saul*, No. 3:18-cv-00261 (KAD), 2020 WL 1307106, at *3 (D. Conn. Mar. 18, 2020) ("The severity regulation requires the claimant to show that [she] has an impairment or combination of impairments which significantly limits the abilities and aptitudes necessary to do most jobs. . . . It is the claimant's burden to provide medical evidence which demonstrates the severity of her condition." (citations and internal quotation marks omitted)). Although the plaintiff is correct that the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be sufficient severity[,]" *Thompson v. Astrue*, 416 F. App'x. 96, 97 (2d Cir. 2011) (*citing* 20 C.F.R. §§ 404.1523 and 416.923), the plaintiff must make a *de minimis* showing of medical severity as to an alleged medical issue for the ALJ to even consider it. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." (*quoting* 20 C.F.R. § 404.1529(a)).

The plaintiff reported chest pain on one occasion in February 2018 (Tr. 619), but there are no other complaints of such pain during this relevant period. Similarly, during the relevant time period of November 2017 through the date of the ALJ's decision, the plaintiff received no treatment for substance abuse nor is there a recommendation that such treatment would be

necessary.  (*See* Tr. 636 (March 2018, noting alcohol abuse "in remission"); Tr. 652 (October 2018 diagnosis of alcohol abuse); *but see* Tr. 340, 344 (reference in 2014 to alcohol and illegal oxycodone consumption)).  Because the plaintiff fails to establish even a *de minimis* showing of medical severity with respect to the alleged medical issues, the ALJ did not err in neglecting to consider them in his step two analysis.

In October 2017, the plaintiff was diagnosed with bipolar disorder (Tr. 441; *see* Tr. 652 (October 3, 2018 diagnosis of bipolar II disorder) Tr. 663-68 (November 1, 2018, noting improvement in controlling her emotions)).  There are, however, no records from a treating source detailing limitations due to bipolar disorder.  Rather, the record includes a history of anxiety and anger issues (*see* Tr. 435, 437, 441, 443, 517), and at the hearing, the ALJ explicitly recognized those issues. (Tr. 59 (asking the plaintiff, "You yell at people a lot. Don't you?").  In his decision, the ALJ concluded that the plaintiff's posttraumatic stress disorder is a severe impairment, and the ALJ accounted for resulting limitations related to this impairment, which included her anger issues.  Specifically, in his RFC, the ALJ concluded that the plaintiff could have no contact with the public and could not work in teams with supervisors or coworkers.  (Tr. 442, 652).  Thus, the ALJ did not err in failing to consider the plaintiff's mental impairments in combination.

Additionally, the ALJ did not err in his treatment of the plaintiff's degenerative disc disease of the cervical spine and the plaintiff's chronic pain.  At step two, the ALJ determined that the plaintiff's cervical spine degenerative disc disease was non-severe because it did not cause "more than a minimal limitation in [her] ability to perform basic work activities." (Tr. 24).  The record reveals that, in June 2017, the plaintiff complained of neck pain (Tr. 417-18); she underwent an X-ray of her cervical spine which revealed "loss of disc space" in her spine, consistent with degenerative disc disease.  (Tr. 429). In August 2017, the plaintiff was referred for an MRI of the

cervical spine (Tr. 507-08; Tr. 414-15), which, as the ALJ recited, revealed "mild disc bulge with spondylosis and no significant spinal canal or neural foraminal narrowing. Examination of the claimant showed cervical paraspinal tenderness, excellent rotation and lateral bend, and normal reflexes." (Tr. 24; *see* Tr. 417, 425-26)). There is no evidence that the plaintiff's spinal impairment significantly limited her ability to perform work.

Additionally, the ALJ did not err in failing to find that the plaintiff's chronic pain was a severe impairment.  Rather, he appropriately considered her pain as a symptom of her severe impairments and considered it in combination with her impairments. In his decision, he noted the plaintiff's treatment of physical therapy and pain management medications for her impairments that caused chronic pain.  (Tr. 24).

The plaintiff satisfied her burden of establishing that she had at least some severe impairments at step two, and the ALJ did not err in his determination that some of the plaintiff's impairments were not severe.  But, even if the ALJ erred in failing to find other impairments severe at step two, such an error is harmless when the ALJ continues with the five-step analysis with a consideration of all impairments, as he did in this case. *See Melendez v. Colvin*, No. 1:13-CV-1068, 2015 WL 5512809, *5 (N.D.N.Y. Sep. 16, 2015) ("[T]he omission of one or more severe impairments at step two may only be deemed harmless where the ALJ also later considers the effects from the omitted impairment as party of the ultimate RFC determination.").

At step three, the ALJ found that the plaintiff's impairments, alone and in combination, did not meet or medically equal the requirements of a listed impairment.  (Tr. 24-25).  The ALJ specifically considered sections 1.00 (Musculoskeletal System) 4.00 (Cardiovascular System), 11.00 (Neurological Disorders), and 12.00 (Mental Disorders) to determine whether any of the plaintiff's impairments met or medically equaled a listed impairment in 20 C.F.R. Part 404 Subpart

P, Appendix 1. (Tr. 24-25). The ALJ concluded that the plaintiff's degenerative joint disease of the right shoulder did not meet Musculoskeletal Listing 1.02 because the record did not "demonstrate gross anatomical deformity, chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imagining . . . resulting in the inability to ambulate effectively or the inability to perform fine and gross movements effectively." (Tr. 24). Although the plaintiff is correct that there is evidence of chronic pain, which the ALJ considered, the record lacks substantial evidence to support a finding of chronic joint pain with the additional limitations, and acceptable medical imaging.

The ALJ appropriately relied on the MRI results from August 11, 2017. (Tr. 425-27). The impressions of the shoulder MRI were that the plaintiff had "mild glenohumeral osteoarthritis with degenerative tear of the inferior labrum" and "rotator cuff tendinosis with a very small bursal surface partial-thickness tear of the supraspinatus tendon at its anterior insertion involving much less than 50% of tendon thickness." (Tr. 428). Additionally, as the ALJ cited, on August 30, 2017, the plaintiff began a chronic opioid therapy ("COT") trial and was prescribed Percocet to help alleviate her shoulder and hand pain, which ultimately "helped to reduce some of her pain," such that she was "[a]ble to work and [perform] her [activities of daily living] with less pain." (Tr. 501, 505).

Similarly, in his assessment of the plaintiff's hand impairment, the ALJ appropriately concluded that her carpal tunnel syndrome did not meet Listing 11.14. (Tr. 25). The ALJ relied on post-surgical records reflecting "good alleviation of hand pain" (Tr. 465), and he noted that the record did "not demonstrate disorganization of motor function in two extremities," or "marked limitation in physical functioning[.]" (Tr. 25). It is the plaintiff's burden to establish that she

meets all of the "specified medical criteria of a listing," and in this case, the plaintiff has failed to meet her burden of proof at step three. *See Loescher v. Berryhill*, No. 16-CV-300-FPG, 2017 WL 1433338, at *3 (W.D.N.Y. Apr. 24, 2017).

      B.    <u>SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S RFC FINDING</u>

As discussed above, the ALJ found that the plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that she could frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, crawl, and handle and finger bilaterally; could have no contact with the public; and could not work on a team with coworkers. (Tr. 26). The substantial evidence of record supports the ALJ's RFC determination.

The ALJ, having considered the evidence, determined that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 27). In reaching his conclusion, the ALJ relied on observations from treaters concerning the plaintiff's range of motion and strength improvements, her MRI results, and her opioid treatment regimen, which the plaintiff herself stated improved her ability to work and perform her activities of daily living. (Tr. 27-28; see Tr. 395, 428, 464, 497, 501, 543, 551, 677-687). The ALJ noted that the plaintiff testified at her hearing that she had pain in her neck, right shoulder, and hands, and that the tightness in her right shoulder was not resolved with medication.  (Tr. 27).  The medical record supports the plaintiff's complaints of right shoulder pain, limitations in her range of motion in May and June 2017, and a history of prescription opioid treatment. (*See* Tr. 417, 510 (reporting pain was a "constant 10 out of 10"); Tr. 615, 617 (documenting prescribed Percocet)). Despite her pain levels, however, in July and September 2017, and October 2018 the plaintiff's treaters observed "full

range of motion of the shoulder, full range of motion without pain, normal flexion, extension and

rotation." (Tr.  497, 511, 611). As the ALJ indicated, the physical therapy notes showed a "range

of motion that was within functional limits, 4 to 4+/5 strength, normal posture, intact sensation,

and ability to independently groom," as well as some reports of improvement.  (Tr. 27). In fact,

the plaintiff stated in physical therapy that her shoulder felt "much better" on April 24, 2017, May

19, 2017, and July 31, 2017. (Tr. 675, 677, 687).  Moreover, rather than consistent entries of

"constant pain," the record reflects that the plaintiff's pain was "on and off." (*See* Tr. 483, 487,

492, 496, 500, 503, 507, 510).  Additionally, the ALJ considered the plaintiff's MRI results from

August 7, 2017, which showed mild degenerative changes, a degenerative tear in the labrum, and

rotator cuff tendinosis.  (Tr. 27).[9]

The plaintiff's argument necessarily requires that the Commissioner ignore inconsistencies

and afford more weight to the claimant's subjective complaints of pain than to the substantial

evidence of the record. (*See* Pl.'s Mem. at 11). The ALJ need not give deference to the plaintiff's

subjective reports of pain, particularly when those reports are inconsistent with the record. *See*

*Genier*, 606 F.3d at 49 ("When determining a claimant's RFC, the ALJ is required to take the

claimant's reports of pain and other limitations into account … but it is not required to accept the

claimant's subjective complaints without question; he may exercise discretion in weighing the

credibility of the claimant's testimony in light of the other evidence in the record."). In fact, it is

the ALJ's findings on credibility determinations that are entitled to great deference. *See Collazo v.*

*Saul*, No. 3:19-cv-01174 (TOF), 2020 WL 7021680, at *6 (D. Conn. Nov. 30, 2020) ("The

---

[9] Previous results from an MRI of the plaintiff's right shoulder, taken on May 23, 2017, revealed "mild degenerative changes at the AC joint and inferior glenohumeral joint," and the doctor observed that the plaintiff had a "decreased range of motion on internal rotation."  (Tr. 431). Contemporaneous treatment records, however, reflect full range of motion. (*See*  Tr.  497, 511, 611).

credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." (citation and internal quotation marks omitted)).

Similarly, the substantial evidence supports the ALJ's findings as to the plaintiff's carpal tunnel syndrome. On November 10, 2017, the plaintiff underwent an endoscopic carpal tunnel release on her right side. (Tr. 466). On November 15, 2017, the plaintiff had an initial evaluation at the Hand Center and was provided with a treatment plan to span eight weeks. (Tr. 478). During her third session on December 15, 2017, the plaintiff reported feeling "much better" and stated that her pain level was at a five out of ten. (Tr. 475). Tina Simpson, the plaintiff's physical therapist, recorded that the plaintiff's strength had improved with general use of her right hand and that pain had decreased following her return to work. (*Id.*).

The plaintiff's December 13, 2017 follow-up at the Hand Center showed that her surgery was successful and provided "good alleviation" of her pain, numbness, and tingling. (Tr. 464-65). Although the plaintiff complained of continued pain following surgery, her flare ups with pain generally arose only after several hours of typing. (Tr. 411, 464). Notably, the plaintiff was discharged after just four of her eight scheduled hand therapy sessions because of her improving range of motion and strength. (Tr. 473-81). At that time, the plaintiff's pain was a zero on a scale of ten "most of the time," and a seven out of ten "sometimes." (Tr. 473). Christopher J. Dillon, PA-C opined that the plaintiff was also able to resume full duty work. (Tr. 473; *see also* Tr. 465). The examination notes post-dating her clearance to return to work describe normal motor strength and sensory findings. (Tr. 533, 540, 543, 551, 557, 561, 619). The ALJ explicitly relied on these findings in reaching the determination that the plaintiff's carpal tunnel syndrome did not preclude her from employment. (Tr. 28). Moreover, noting the consistency with the medical record, the ALJ appropriately relied on the assessment of Dr. Brent Packer, a state agency consultant, who

opined that the plaintiff could lift and/or carry ten pounds frequently and twenty pounds occasionally; stand and/or walk six out of eight hours; sit six out of eight hours; occasionally balance, and climb ramps, stairs, ladders, ropes and scaffolds; frequently stoop, kneel, crouch, and crawl; and she could perform unlimited reaching, and frequent handling and fingering. (Tr. 81-84, 96-99).

Additionally, the ALJ appropriately concluded that, although Dillon cleared the plaintiff to return to work, his opinion that she was able to resume "full duty work" was entitled to "partial weight" given both its consistency with the treatment notes, and its inconsistency with the plaintiff's "longitudinal functioning." (Tr. 30). As the record evidences, the plaintiff's attempt to return to full time work was unsuccessful even though, in January 2018, she was discharged from hand therapy with a pain rating of zero out of ten. (Tr. 473).

As to the plaintiff's hypertension, the substantial evidence similarly shows that the plaintiff's impairment did not preclude employment. The record reveals that the plaintiff had hypertension "since at least 2007," yet continued to perform substantially gainful work until at least 2017. (Tr. 402). On May 18, 2016, prior to the plaintiff's alleged onset date, APRN Kristen Haney opined that the plaintiff "may need to be absent up to 48 hours for treatment" for her hypertension, and "if [her] blood pressure remains elevated during [a] visit[,] [she] may need to be sent to the hospital which may last up to 24-48 hours." (Tr. 367). The ALJ appropriately assigned this opinion "little weight" given its speculative nature. (Tr. 30). Moreover, the ALJ explicitly referenced the evidence concerning the plaintiff's noncompliance with her medication regimen and failing to monitor her blood sugar at home. (Tr. 28, citing Tr. 393, 398). Despite her deviation from the treatment plan, the plaintiff "had no significant symptoms from her hypertension including no headaches, no dizziness, no chest pain, no dyspnea, and no blurry vision. Examination

of her cardiovascular system was normal." (*Id.*, citing Tr. 391, 393). Based on the evidence with respect to the plaintiff's treatment, coupled with the evidence that the claimant had not required more significant care for her hypertension, the ALJ reasoned appropriately that her impairment would not preclude her from work. (Tr. 28).

The ALJ also went through the plaintiff's extensive mental health records, which showed evidence of mood swings, depression, anxiety, and trouble sleeping. (Tr. 28-29, 340-363). The plaintiff's record begins with therapy notes from December 2013, nearly four years before her alleged onset date of disability, when she was treated for anxiety.  (Tr. 348).  In April 2014, the plaintiff was seen for individual therapy to address her anger and coping skills.  (Tr. 352).  Despite some violent episodes pre-dating her alleged onset date of disability, the plaintiff's treaters consistently observed her oriented, well-groomed, cognitively intact, alert, and receptive to feedback. (Tr. 348-49, 341, 355-56, 360, 529; *see* Tr. 359 (In June 2014, the plaintiff's therapist noted that the staff had concerns with the plaintiff's loud and angry behavior; she was working on gaining insight into her aggressive behaviors; she was "very argumentative" and "unwilling to listen."); Tr. 580-87 (In April 2017, the plaintiff was seen at the emergency room after she was "jumped by [three] women[.]" The plaintiff acted out violently, used profanities, and threatened to sue hospital staff.)). Notably, the plaintiff stated that her goals with therapy were to "take steps toward achievement" and get better at coping with her trauma and managing her anger. (Tr. 351-52).  In February 2018, the plaintiff reported that she was "struggling at work with [her] supervisor who [said the plaintiff] has problems wit[h] other workers."  (Tr. 633). The plaintiff reported that she was "determined to continue working." (Tr. 629).[10] The plaintiff was seen by Dr. Faye Heisler

---

[10] Dr. Moore recorded that the plaintiff presented as alert, cooperative, well-groomed, and neatly dressed. (Tr. 341). Dr. Moore observed that the plaintiff made good eye contact with no abnormal movements, no psychomotor agitation, and no psychomotor retardation. (*Id.*). Dr. Moore also observed that the plaintiff was oriented, attentive, and logical, showing intact memory and concentration. (*Id.*). Dr. Moore recorded the plaintiff 's mood as sad and her affect as

from March 15, 2018 to November 1, 2018.  (Tr. 636-58). In a Psychiatric Evaluation completed on March 15, 2018, and in subsequent evaluations noted by the ALJ, Dr. Heisler described the plaintiff as well-groomed and cooperative, with intact thought process, cognitive functioning, and judgment.  (Tr. 638-39, 644-45, 651-52, 657-58).  The plaintiff's pressured speech, anxious mood and hyperactive and agitated motor activity was also noted.  (Tr. 638-39).  According to the plaintiff, she was out of work since March 2018 because "they do not have restrictive duty."  (Tr. 643).  In November 2018, Dr. Heisler noted that the plaintiff "seems able to use much better judgment."  (Tr. 665).

The ALJ considered Dr. Heisler's treatment records, including the plaintiff's well-documented history of anger, impulsive behavior, depression and anxiety. (Tr. 30).  Additionally, he considered her ability to live on her own and manage her personal needs, as well as Dr. Heisler's consistent assessment that the plaintiff was "alert, oriented, cooperative, had intact thought process, intact memory, intact cognitive functioning, and intact insight." (*Id.*).

Acknowledging the plaintiff's history of outbursts and anger, the ALJ concluded that the plaintiff's impairments restrict her from having contact with the public and working on a team with coworkers. (Tr. 26).  The ALJ's conclusions are consistent with the treatment records, the findings of Dr. Heisler, and the opinions of the state agency consultants.

There are two state agency psychological consultants' assessments in the record.  The first was completed on October 23, 2017, by Jerrold Goodman, Ph.D. (Tr. 84-85). Dr. Goodman opined that the plaintiff had moderate limitations with extended periods of attention and concentration,

---

labile and constricted. (*Id.*). Dr. Moore noted that the plaintiff had problems with anger and impulse control as well as impaired insight and judgment. (Tr. 342). Dr. Moore also noted that the plaintiff did not appear psychotic or severely depressed at the time of the evaluation or by history but did have some symptoms of both as well as symptoms of ADHD. (*Id.*). Dr. Moore noted further that the plaintiff did have anxiety and PTSD symptoms and that she needed relaxation techniques, anger management, substance abuse counseling, and further observation and examination. (*Id.*).

completing a normal workday and workweek, interacting with the general public, and responding appropriately to supervisory criticism. (*Id.*).  She could relate appropriately to coworkers and supervisors but would be sensitive to supervisory criticism. (Tr. 85).  Dr. Goodman concluded that the plaintiff appeared able to perform at least simple routine tasks but working with the general public would not be appropriate. (Tr. 80, 85, 95, 99-100).

At the reconsideration level on February 8, 2018, state agency psychological consultant Christopher Leveille, PsyD., assessed that the plaintiff could relate appropriately to both coworkers and supervisors, but she would be sensitive to criticism from supervisors, and working with the general public would not be appropriate. (Tr. 117-18, 133-35).

The ALJ did not adopt Dr. Leveille's and Dr. Goodman's conclusions that the plaintiff "could relate appropriately to both coworkers and supervisors," as such an assessment was not consistent with the record.  He did, however, adopt the latter portion of those opinions, which was consistent with the opinion of Dr. Heisler.

The plaintiff argues also that the ALJ did into consider the "opinions of the medical professionals[,]" but, as discussed above, there are no other opinions in the record.  (Pl.'s Mem. at 19-20). While the treatment records shed light on the plaintiff's functional limitations, the record does not include other medical opinions as to the plaintiff's physical or mental impairments. The ALJ appropriately addressed the treatment and examination notes throughout his decision.  The ALJ explained that he relied, in part, on the state agency opinions regarding the plaintiff's mental impairment because they were "consistent" with the "no more than moderate" limitations documented in the record. (Tr. 30).  The ALJ is entitled to rely on the opinions of state agency physicians if they are consistent with the record as a whole. *See Wessel v. Colvin*, 3:14CV00184 (AVC), 2015 WL 12712297, at *7 (D. Conn. Dec. 30, 2015) (citation omitted).  "The report of a

[s]tate agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record." *Frye ex rel. A.O.*, 485 F. App'x 484, 487 (2d Cir. 2012); *see also Baszto v. Astrue*, 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.").  Additionally, when formulating an RFC, the ALJ must consider "the entire record, as a whole[,]" and is "free 'to piece together relevant medical facts from the findings and opinions of multiple physicians[,]'" which the ALJ did in this case.  *Seekins v. Astrue*, No. 3:11CV00264 (VLB)(TPS), 2012 WL 4471266, at *8 (D. Conn. Aug., 14, 2012) (quoting *DiMaggio v. Astrue*, No. 5:10-cv-172, 2011 WL 4748280, at *11 (D. Vt. Oct. 6., 2011) (additional citation omitted).

Moreover, the plaintiff has failed to satisfy her burden of proving the need for a more restrictive RFC than the RFC reached by the ALJ.  The Court is not tasked with deciding "whether there is substantial evidence supporting the appellant's view[,]" but rather, "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in the original) (citations omitted).  The Court concludes that the ALJ appropriately weighed the evidence of the record, and substantial evidence supports the ALJ's RFC determination.

C.    TESTIMONY OF THE VOCATIONAL EXPERT

Finally, the plaintiff contends that the ALJ's conclusion at step five was not supported by substantial evidence. (Pl.'s Mem. at 20). Specifically, the plaintiff argues that the hypothetical as to the plaintiff's limitations presented to the vocational expert was inconsistent with the evidence of record. (Pl.'s Mem. at 20-21). Additionally, the plaintiff challenges the ALJ's hypothetical that

she could only have "occasional contact with the public and not work on a team with co-workers[,]" when the ALJ concluded that the plaintiff could have no public contact. (*Id.*).

The plaintiff is correct that, when the ALJ posed a hypothetical that included "occasional contact with the public," the vocational expert testified that such an individual could perform the work of a garment folder, an assembler, and a hand packager. (Tr. 67-68). That said, however, the plaintiff's counsel then proposed that the hypothetical instead include a restriction to "no contact with the public and only occasional [contact] with co-employees and supervisors." (Tr. 71). In response to that hypothetical, the vocational expert testified that such a person could still perform the work of a garment folder, assembler and inspector. (Tr. 71-72).

The plaintiff contends that "occasional [contact] with co-employees and supervisors" is contrary to the ALJ's finding that the plaintiff could not work on "a team with co-workers." (Pl.'s Mem. at 21). There is certainly a distinction between the more restrictive limitation of occasional contact and the more collaborative nature of working on a team. *See Kimberly M.S. v. Comm'r of Soc. Sec.*, 1:20-cv-615-JJM, 2012 WL 2566755, at *3-4 (W.D.N.Y. Jun. 23, 2021) (noting distinction between not being able to perform "team, tandem, or codependent work" and "occasional interaction with a supervisor or coworkers"); *David N. v. Comm'r of Soc. Sec.*, 19-cv-219-LJV, 2021 WL 2525096, at *4 (W.D.N.Y. Jun. 21, 2021). Thus, if the vocational expert concluded there was work available for someone limited to "occasional contact" with supervisors and co-workers, those jobs would still exist if someone could be in occasional contact but could not work on a team with those supervisors and co-workers.

The ALJ appropriately relied on the vocational expert's testimony. For the reasons explained above, the hypotheticals posed to the vocation expert were based on substantial evidence

in the record that "accurately reflect[ed] the limitations and capabilities of the claimant involved." *McIntyre v. Colvin*, 758 F.3d 146, 153 (2d Cir. 2014) (multiple citations omitted).

      Accordingly, the Court affirms the decision of the Commissioner.[11]

## VI.   CONCLUSION

      For the reasons stated above, the plaintiff's Motion for Reversal of the Commissioner's decision (Doc. No. 33) is DENIED, and the defendant's Motion to Affirm (Doc. No. 35) is GRANTED.

      This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

      Dated this 9th day of September 2021 at New Haven, Connecticut.

                          _/s/Robert M. Spector, USMJ
                          Robert M. Spector
                          United States Magistrate Judge

---

[11] The Court thanks *pro bono* counsel for her thorough and thoughtful advocacy on behalf of the plaintiff.  Upon the filing of this decision, *pro bono* counsel is relieved of her appointment.  Because counsel was appointed in this case under Local Civil Rule 83.10, this Court shall retain jurisdiction to adjudicate any dispute between such counsel and the client arising from the representation in this case, including without limitation, a grievance or malpractice claim.